IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF NORTH CAROLINA

JOYCE F. RUSSELL,                    )
                                     )
              Plaintiff,             )
                                     )
         v.                          )      1:07CV00506
                                     )
MICHAEL J. ASTRUE,                   )
Commissioner of Social Security,     )
                                     )
              Defendant.             )

### MEMORANDUM OPINION AND RECOMMENDATION OF MAGISTRATE JUDGE ELIASON

Plaintiff seeks judicial review pursuant to 42 U.S.C. § 405(g) of the Commissioner's final decision denying her claims for Social Security disability insurance benefits and a period of disability. The Commissioner's denial decision became final on May 11, 2007, when the Appeals Council found no basis for review of the hearing decision of the Administrative Law Judge (ALJ). Plaintiff has filed a motion for summary judgment, Defendant has filed a motion for judgment on the pleadings, and the administrative record has been certified to the Court for review.

### The Plaintiff

Plaintiff, who was 48 years old at the time of her hearing in front of the ALJ, has a ninth grade education. Her past relevant work experience was as a screen printer and a cashier/food preparation worker. Plaintiff alleged disability as of June 23, 2003, due to a back injury.

## Plaintiff's Issues

Plaintiff has presented several issues to the Court for review. Initially, she contends that the ALJ erred in not finding that she suffered from additional severe impairments. Next, she claims that the ALJ erred in not giving controlling weight to the opinions of a treating physician as to Plaintiff's limitations. Third, Plaintiff argues that the ALJ erred in finding that her mental impairments did not satisfy a Listing. Finally, Plaintiff alleges that the ALJ erred in finding that she was capable of performing her past relevant work (PRW).

## Discussion

In reaching a decision on Plaintiff's claim, the ALJ followed the five-step analysis set out in the Commissioner's regulations. See 20 C.F.R. § 404.1520. Under the regulations, the ALJ is to consider whether a claimant (1) is engaged in substantial gainful activity; (2) has a severe impairment; (3) has an impairment that meets or equals the requirements of a listed impairment; (4) can return to his past relevant work; and if not, (5) whether he can perform other work. Id. The burden of persuasion is on the claimant through the fourth step. See Hunter v. Sullivan, 993 F.2d 31, 35 (4th Cir. 1992). If the claimant reaches the fifth step, the burden shifts to the Commissioner to produce evidence that other jobs exist in the national economy that the claimant can perform considering his age, education and work experience. Id.

The ALJ first found that Plaintiff had not engaged in substantial gainful activity since the date of her alleged onset of

-2-

disability (AOD). He next found that Plaintiff suffered from the severe impairments of a back disorder and an anxiety-related disorder. The ALJ determined that, although Plaintiff alleged brain tumor/residuals of removal of meningioma/residuals from a stroke/cerebral vascular accident (CVA), bilateral carpal tunnel syndrome, and residuals from bilateral carpal tunnel release, these impairments were not established as severe by the objective medical record. The ALJ decided that Plaintiff's severe impairments did not meet or medically equal the requirements of any listing in Appendix 1, Subpart P, Regulation Number 4.

The ALJ then determined that Plaintiff had the residual functional capacity (RFC) to perform "medium" work with no postural, manipulative, visual, communicative, or environmental limitations. (Tr. at 16.) He added that Plaintiff had "moderate" limitations in concentration, persistence and pace, and in social functioning, but could perform simple, routine, repetitive tasks. (Id.) Based on this RFC, the ALJ concluded that Plaintiff could return to her PRW.

The scope of review by this Court of the Commissioner's decision denying benefits is limited. Frady v. Harris, 646 F.2d 143, 144 (4th Cir. 1981). The Court must review the entire record to determine whether the Commissioner has applied the correct legal standards and whether the Commissioner's findings are supported by substantial evidence. Hays v. Sullivan, 907 F.2d 1453, 1456 (4th Cir. 1990). Where this is so, the Commissioner's findings are conclusive. The Court may not reweigh conflicting evidence that is

-3-

substantial in nature and may not try the case de novo. Id. The Court may not make credibility determinations, or substitute its judgment for that of the ALJ's. Johnson v. Barnhart, 434 F.3d 650, 653 (4th Cir. 2005). "Substantial evidence" has been defined as "'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion,'" Richardson v. Perales, 402 U.S. 389, 401, 91 S. Ct. 1420, 1427, 28 L. Ed. 2d 842 (1971) (citation omitted), or evidence which "consists of more than a mere scintilla of evidence but may be somewhat less than a preponderance," Shively v. Heckler, 739 F.2d 987, 989 (4th Cir. 1984) (citations omitted).

## Issue One

Plaintiff's first issue for review is whether the ALJ erred in failing to find that she suffered from additional severe impairments. According to Administration practice, an impairment is "not severe" if it is only "a slight abnormality . . . that has no more than a minimal effect on the ability to do basic work activities." Social Security Ruling (SSR) 96-3p, 61 Fed. Reg. 34468, 34469. See also 20 C.F.R. § 404.1520(c). The Regulations provide that "basic work activities" include:

> (1) Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;
> (2) Capacities for seeing, hearing, and speaking;
> (3) Understanding, carrying out, and remembering simple instructions;
> (4) Use of judgment;
> (5) Responding appropriately to supervision, co-workers and usual work situations; and

-4-

(6) Dealing with changes in a routine work setting.
Id. § 404.1521(b).

Plaintiff relies on a report by Dr. Kenneth Detrick, who performed a psychiatric examination of Plaintiff at the Administration's request. Specifically, Dr. Detrick concluded that Plaintiff "has some specific cognitive losses probably secondary to her CVA in regards to mathematical abilities." (Tr. at 219.) Because decreased ability to perform mathematical calculations is not a "basic work activity," this limitation would not result in Plaintiff's CVA or removal of meningioma being a "severe" impairment.

Plaintiff disputes the interpretation of a state agency expert that her cognitive disorder was "mild" because Dr. Detrick never expressed this opinion. Yet in addition to the doctor's statements discussed above, he observed that Plaintiff "apparently had no major sequelae except perhaps some difficulty with cognition."[1] (Tr. at 218.) And as Plaintiff herself points out, Dr. Detrick assessed her prognosis as "fair" as to her panic and anxiety, but also "good" as to her depression. (Tr. at 220.) Overall, the Court finds that the adjective "mild" is not an unreasonable or unsupported description of the impact of Plaintiff's CVA and removal of meningioma, and finds no error in the subsequent finding of the state agency expert.

_____

[1]Plaintiff told a pain management expert that she had suffered *no* symptoms with her apparent stroke. (Tr. at 294.) Records from her treating physician's practice state that Plaintiff experienced a "good recovery" from her CVA over 20 years earlier. (Tr. at 292.)

-5-

Plaintiff further argues that the ALJ erred in failing to find her mental impairments to be severe. But, as discussed above, Dr. Detrick found that Plaintiff was impaired in her ability to perform calculations, which is not a basic work activity, and there is no indication that he found any other deficits. Although he thought she might have some difficulty with cognition, he nonetheless gave her, at worst, a "fair" prognosis.

Also, Plaintiff told Dr. Detrick that she believed her depression was in remission. (Tr. at 217.) She stated that she did housework, shopped, visited with others, and took care of a child and pet. (Tr. at 218.) Although Plaintiff expressed some difficulty with crowds and strangers, she added that she got along with others, and did so when she was working. And she nevertheless enjoyed going out with her friends and with her daughter, and she shopped and visited.

Moreover, Dr. Detrick found no abnormalities on Plaintiff's mental status examination. He concluded that her concentration and attention were impaired, but only mildly. (Tr. at 219.) The doctor explained that Plaintiff exhibited no gross abnormality in her attitude or behavior and no psychotic reactions, and there was no evidence of any formal thought disorders. (Tr. at 218, 219.) Plaintiff's mental trend and thought content appeared to be normal, except that Plaintiff complained of some agoraphobia and difficulty with crowds and strangers. (Tr. at 218.) Plaintiff denied current depression or suicidal ideation. She admitted that medication helped her depression and anxiety. Cf. Gross v. Heckler, 785 F.2d

-6-

1163, 1166 (4th Cir. 1986) (if symptoms are, or can be, reasonably controlled by medication, they may not be considered disabling under the Act).

Upon Dr. Detrick's testing, Plaintiff cognition was intact, except at a level beyond simple mathematical calculations. (See Tr. at 219.) Plaintiff told the doctor that she was not "able to do calculations *as well as she used to*" (id.); not that she was incapable of doing any. Clearly, Dr. Detrick's report does not indicate that Plaintiff's suffered any more than a minimal effect on her ability to perform mental basic work activities.

Plaintiff turns for support to the statement of her treating physician, Dr. Ronnie Barrier, that she had frequent deficiencies of concentration, persistence or pace, and repeated episodes of deterioration in work or work-like settings. (Tr. at 408.) There are, however, no notations in Dr. Barrier's records or otherwise to support this statement and, accordingly, the ALJ did not err in failing to give it preference. Nor is Dr. Barrier's statement consistent with Dr. Detrick's report, inasmuch as Dr. Detrick made no similar finding.

Plaintiff next refers to Dr. Barrier's statement that she experienced significant limitations in her ability to perform repetitive reaching, handling, and fingering. (See Tr. at 406.) Dr. Barrier's assessment, performed in September 2005, was apparently based on Plaintiff's treatment by other doctors, while his own treatment of Plaintiff for upper body complaints apparently was minimal, and the doctor's assessment failed to include a

-7-

diagnosis that would explain such restrictions. (<u>See</u> Tr. at 403; <u>see also</u> Tr. at 273 (paresthesias of hand); Tr. at 290 (right neck pain)). However, in July 2005, Plaintiff underwent a right carpal tunnel release and, in September 2005, she underwent a left carpal tunnel release. (Tr. at 431; <u>see</u> Tr. at 499.) Plaintiff did well after these surgeries. (<u>See</u> Tr. at 255-57). By October 2005, Plaintiff had full range of motion with grip strength of 5 of 5. (Tr. at 498.) She subsequently had no complaints of wrist or hand pain.

After Dr. Barrier's assessment, Plaintiff's records reveal a single complaint of right shoulder pain in December 2005 (<u>see</u> Tr. at 334), but no further upper extremity complaints until April 2006. She first reported, to her orthopedic physicians, numbness and tingling in her thumb and finger (Tr. at 497), and then right neck and arm pain with tingling into the right elbow (Tr. at 492). However, Plaintiff underwent an anterior cervical decompression and fusion and, by the end of June 2006, her symptoms were gone. (<u>See</u> Tr. at 486.) Plaintiff told her orthopedic surgeon, Dr. Thomas Ellison, that she was "95% better" and had only mild pain. (Tr. at 487.) There are no other upper extremity complaints in the record. Accordingly, although there may have been *some* substantiation to Dr. Barrier's assessment at the time he made it, there was none by the end of the relevant period. <u>Cf.</u> 20 C.F.R. § 404.1509 ("Unless your impairment is expected to result in death, it must have lasted or must be expected to last for a continuous period of at least 12 months.").

Case 1:07-cv-00506-WO-PTS   Document 15   Filed 01/20/09   Page 8 of 31

**Issue Two**

Plaintiff next takes issue with the ALJ's failure to adopt the RFC assessment which Dr. Barrier completed. It is for the ALJ and not the Court to assess the weight to be given medical opinions. The non-exclusive list of factors to be used include (1) whether the opinion is based on an examination, (2) the treatment relationship between plaintiff and the physician, (3) whether any evidence supports the opinion, (4) the consistency of the opinion with other opinions and the evidence, and (5) whether the physician is a specialist. Johnson v. Barnhart, 434 F.3d 650, 654 (4th Cir. 2005).

In reviewing this claim, the Court is guided by a number of factors. Thus, while the ALJ is not bound by the opinion expressed by a treating physician, to the extent that the treating physician's opinion is based on continuous observation, that opinion is entitled to great weight. Moreover, a highly qualified treating physician, such as a specialist, is accorded extra weight. Stawls v. Califano, 596 F.2d 1209 (4th Cir. 1979). Indeed, an examining specialist may well take precedence over a treating physician because of the special expertise. Campbell v. Bowen, 800 F.2d 1247 (4th Cir. 1986). But, the ALJ should not make a decision simply on the number of opinions expressed by treating physicians or specialists. Sterling Smokeless Coal Co. v. Akers, 131 F.3d 438 (4th Cir. 1997).

Additionally, there is no rule that a non-examining physician's opinion is entitled to less weight than a treating

-9-

physician's opinion. In all events, both opinions must be consistent with medical findings and other evidence in the record. Grizzle v. Pickands Mather & Co./Chisolm Mines, 994 F.2d 1093 (4th Cir. 1993). Thus, a more recent non-treating examination may be reason for discounting the opinion of a treating physician. Hunter v. Sullivan, 993 F.2d 31 (4th Cir. 1992). This is so particularly if there is persuasive contrary evidence or plaintiff has failed to follow treatment plans. Id. Thus, a non-treating physician's opinion may be accorded significant weight when it is based on the medical records, is supported by objective medical evidence, and is consistent with other medical opinions. Johnson, 434 F.3d at 657.

Although the opinions of treating physicians may be given controlling weight in making a determination of disability, they will not be given such weight if not supported by medically acceptable clinical and laboratory techniques or if they are not consistent with other substantial evidence in the record. Craig v. Chater, 76 F.3d 585, 590 (4th Cir. 1996). A physician's opinion may be discounted based on a number of factors, such as a relatively short treatment time, lack of independent evaluation, or undue reliance simply on plaintiff's statements in forming the opinion, etc. Sterling, 131 F.3d 438. Little weight may be accorded an opinion based mainly on plaintiff's subjective complaints. Johnson, 434 F.3d at 657; Mastro v. Apfel, 270 F.3d 171, 178 (4th Cir. 2001). This is especially true with respect to psychological evaluations. Johnson, 434 F.3d at 657. Opinions finding medical problems may be discounted when supported by

-10-

questionable tests, or are conclusory or based on scant supporting evidence. Id.

Opinions of physicians may also be discounted when they are made well after the physicians' last treatment. Id. (one year delay). Furthermore, gaps in the medical record or a record disclosing a "hodgepodge of medical observations and treatments" serve as reasons to find no disability. Id. at 179 (chronic fatigue syndrome). Finally, opinions by physicians regarding the ultimate issue of whether a plaintiff is disabled within the meaning of the Social Security Act are not given controlling weight because the decision on that issue is reserved for the Commissioner alone. 20 C.F.R. § 404.1527(e).

In the instant case, the ALJ gave "little credit" to Dr. Barrier's opinion (Tr. at 25),[2] and the Court finds that substantial evidence supports this decision because of the lack of objective findings in Plaintiff's medical records to support such extreme findings,[3] and because specialists whom Plaintiff consulted did not support these findings either.

---

[2]Thus, it is patently wrong for Plaintiff to suggest that the ALJ failed to consider or analyze Dr. Barrier's assessment.

[3]In her Response Brief, Plaintiff argues that the ALJ erred in requiring objective evidence in contravention of Craig v. Chater, 76 F.3d 585 (4th Cir. 1996). Yet it is not objective evidence of Plaintiff's pain that the ALJ required, which Craig clearly prohibits, but rather, objective evidence of underlying impairments that would support the restrictions which Dr. Barrier recommended. See 20 C.F.R. § 404.1527(d)(3).

-11-

Dr. Barrier's form assessment listed Plaintiff's diagnoses as myofascial pain,[4] back pain, anxiety, depression, and panic disorder. (Tr. at 403.) But Plaintiff's disability application stemmed from an alleged assault in June 2003, which led to a lawsuit against her alleged attacker. (See, e.g., Tr. at 94, 160.) Plaintiff immediately went to the emergency room, where x-rays of her lumbar spine, hip, and pelvis were interpreted as normal. (See Tr. at 188-98.) She saw Dr. Barrier on the following day, and his objective findings were limited to mild spasms, with Plaintiff's motor and sensory exams being intact. (See Tr. at 383.) When she returned two weeks later, Dr. Barrier found some tight muscles but no definite spasms, and Plaintiff's straight leg raising was negative. (Tr. at 382.)

Plaintiff underwent magnetic resonance on her lumbar spine the following week, and the resulting image ("MRI") revealed a degenerating disc at L5-S1 with minimal midline protrusion not causing significant compression. (Tr. at 199.) This MRI was substantially the same as one produced a year prior to Plaintiff's AOD. (See Tr. at 207.) At that time, an orthopedic caregiver had remarked that Plaintiff's left leg sciatic symptoms were "*possibly* related" to her degenerative disc, but he was "not completely convinced." (Tr. at 163 (emphasis added).)

Plaintiff consulted Dr. Ellison a month later, in August 2003, and again had mostly normal objective findings on her physical

---

[4]This diagnosis is not included in the records of Dr. Barrier's treatment of Plaintiff.

examination. (See Tr. at 160.) She returned in a week, but the findings were the same except for globally diminished light touch and pinprick in the left lower extremity.[5] (See Tr. at 157.) Dr. Ellison remarked that Plaintiff's MRI showed only mild stenosis, with no other significant focal nerve compression phenomenon. He did not recommend surgery, but only an injection and the medication Bextra, which prescription Plaintiff had previously neglected to fill. Cf. Hunter v. Sullivan, 993 F.2d 31, 36 (4th Cir. 1992) (claimant's failure, inter alia, to fill prescription for painkiller, which itself was indicated for only mild pain, supported ALJ's inference that claimant's pain was not as severe as he asserted). Dr. Ellison believed that Plaintiff could still work.

There is no indication that Plaintiff sought treatment for back pain again until March 2004, and she did not return to Dr. Barrier's practice for back pain until May *2005*. In the meantime, Plaintiff underwent a physical consultative examination by Dr. Kola Adekanmbi. Plaintiff's musculoskeletal exam was normal, and the doctor found that she could raise her arms over her shoulders without any difficulty. (Tr. at 224.) Plaintiff was able to button and unbutton, and write her clinic assessment, with no problem. Dr. Adekanmbi found Plaintiff's grip strength to be strong and symmetrical.

---

[5]These findings were never repeated.

-13-

The examination showed Plaintiff's muscle strength to be 5 of 5; all of her joints had full range of motion; her deep tendon reflexes and pulses were equal and symmetrical; and she had no sensory deficits. (Tr. at 224-25.) Dr. Adekanmbi observed that Plaintiff's gait was normal, and she was able to sit, stand, and move about the exam room with no difficulty. (Tr. at 225.) On testing, Plaintiff was able to squat and tandem walk.[6] The doctor diagnosed Plaintiff only with low back pain and histories of meningioma and depression.[7] (Tr. at 224.)

Plaintiff's next appointment was with Dr. Hans Hansen, a pain specialist. He described her MRI findings as "rather soft," and opined that she was not "a long term disability candidate." (Tr. at 296.) Dr. Hansen found no new neurological findings, but did observe that Plaintiff had "some distractible features," and that her Waddell's signs[8] were positive, 2 of 5. (Id.) The doctor

---

[6]Plaintiff asserts that the doctor's failure to give an RFC opinion "taints" the conclusions of the state agency experts. However, a RFC is a dispositive finding and, thus, is reserved to the finder of fact. See 20 C.F.R. § 404.1527(e)(1). Moreover, a consultant's opinions are entitled to weight because they are "experts in the evaluation of the medical issues in disability claims under the Act." "Federal Old-Age, Survivors, and Disability Insurance and Supplemental Security Income for the Aged, Blind, and Disabled; Evaluating Opinion Evidence," 65 Fed. Reg. 11866, 11871.

[7]Plaintiff argues that Dr. Adekanmbi's notation of her complaints and that he deemed her "history" reliable support her claims, but a claimant's own statements about her symptoms are not enough to establish disability. 20 C.F.R. § 404.1529(a). Moreover, he only diagnosed her with low back pain and a history of depression and meningioma.

[8]The use of "Waddell signs" is a way to distinguish between physical and behavioral causes of back pain. P. Douglas Kiester & Alexandra D. Duke, "Is It Malingering or Is It 'Real'? Eight Signs that Point to (continued...)

recommended only physical therapy, weight control, and "lifestyle enhancements." (Id.) See also Black v. Apfel, 143 F.3d 383, 386 (8th Cir. 1998) (finding conservative treatment and no surgery consistent with discrediting plaintiff's subjective complaints); Wolfe v. Chater, 86 F.3d 1072, 1078 (11th Cir. 1996) (finding plaintiff's course of conservative treatment was substantial evidence to support the ALJ's decision to discredit plaintiff's subjective complaints).

Plaintiff then returned to Dr. Barrier's practice, where they advised her to contact the pain center. (Tr. at 291.) In May 2004, Plaintiff consulted with Dr. W. Gary Shannon at the Rowan Regional Medical Pain Clinic. Dr. Shannon made two observations that support the ALJ's decision: (1) that Plaintiff was taking only over-the-counter ("OTC") medication for what she described as intractable pain, and (2) that Plaintiff's "[a]bdomen is very tan from a tanning bed," although Plaintiff said that her pain was worse with lying. (Tr. at 293-94.) See also Shively v. Heckler, 739 F.2d 987, 990 (4th Cir. 1984) (the weakness of pain medication is a factor to be considered in assessing the severity of a claimant's pain). He also described her MRI findings as a "[v]ery minimal disc bulge." (Tr. at 295.)

Dr. Shannon's only objective finding on exam was some mild spasm between Plaintiff's shoulder blades and her paravertebral

_____

[8](...continued)
Nonorganic Back Pain," Postgraduate Medicine (Vol. 106, No. 7, Dec. 1, 1999).

musculature, and straight leg raising on the left.  On the other hand, she had normal strength and reflexes; 2+ pulses that were brisk, symmetrical and equal; and a normal sensory exam.  He prescribed a medication for Plaintiff's spasm and advised her to engage in intensive physical therapy.

When Plaintiff returned to Dr. Barrier the following August, she complained of a rash and neck pain (Tr. at 290), but the rash apparently resolved with time, and after October, she did not have a recurrence of neck pain until 2006.  An October 2004 MRI of Plaintiff's cervical spine was unchanged from that performed after Plaintiff's assault, and showed no disc herniation.  (See Tr. at 314.)  Plaintiff received prescriptions and a recommendation for physical therapy.  (Tr. at 321.)

Dr. Barrier's physician's assistant saw Plaintiff in November 2004, when she again complained of low back pain, and also of bilateral hand and finger numbness (Tr. at 283); the upper extremity complaints would resolve with carpal tunnel surgeries within the year (see, e.g., Tr. at 498).  Plaintiff underwent another MRI on her lumbar spine, and the findings were unchanged.  (Tr. at 441.)  Upon testing, Plaintiff's heel, tandem, and toe walking were all normal, as were her reflexes.  (Tr. at 285.)  At Plaintiff's physical several days later, she failed to report taking anything for pain.  (Tr. at 292.)  A month later, she told Dr. Jeffrey Baker, an orthopedic surgeon, that she was taking only OTC medication for pain.  (Tr. at 281.)

Plaintiff did not see Dr. Barrier again for pain complaints until May 2005, but in March, she consulted with another pain specialist, D. Stephen Pociask. Again, Plaintiff confirmed she only took an OTC medication, although she allowed that prescription medications had "provided some benefit." (Tr. at 329.) On exam, Plaintiff exhibited merely a mildly positive Patrick's maneuver on the left, but negative straight leg raising, full motor strength, and intact sensation. (Tr. at 330.) Because Plaintiff said that prior injections had not helped,[9] Dr. Pociask advised that he had nothing to offer her.

When Plaintiff went back to Dr. Barrier in May, she told him that she did not want to undergo a discogram, but would "think about" returning to Dr. Baker. (Tr. at 270.) Dr. Barrier prescribed Plaintiff Tramadol. Plaintiff did not return to Dr. Barrier with myofascial or back pain complaints through the end of the relevant period. Plainly, Plaintiff's minimal treatment for her back/myofascial pain over the 3-year relevant period, and her minimal objective findings – which do not differ from pre-application findings – fail to support the opinion of Dr. Barrier that Plaintiff is too physically limited to engage in substantial gainful activity. Cf. Singh v. Apfel, 222 F.3d 448, 453 (8th Cir. 2000) ("A claimant's allegations of disabling pain may be discredited by evidence that the claimant has received minimal

---

[9]Dr. Hansen had observed, "Although she is stating she had no relief from lumbar epidural today she contradicts this by saying that she did have relief from early epidurals." (Tr. at 296.)

-17-

medical treatment and/or has taken only occasional pain medications.").

A similar analysis applies to Plaintiff's mental impairments. Although Dr. Barrier listed these among Plaintiff's diagnoses, he had been treating Plaintiff since at least 1997. (See Tr. at 178 (listing medications as Klonopin and Wellbutrin.) He acknowledged that her issues were longstanding, when he wrote some months before her AOD that Plaintiff complained of "chronic" anxiety problems. (Tr. at 385.) Plaintiff told Dr. Detrick that her mental health problems began about 1993, and she underwent inpatient treatment in June of that year. (Tr. at 217.)

Yet Plaintiff reported working continuously from 1987 through her AOD. (See Tr. at 143.) The Court presumes that this explains why Plaintiff did not allege any mental health impairments in her disability submissions. (See, e.g., Tr. at 94, 120, 126, 143.) Cf. Dunahoo v. Apfel, 241 F.3d 1033, 1039 (8th Cir. 2001) (finding it "significant" to the severity analysis that plaintiff failed to allege depression in her benefits application). Plaintiff even told Dr. Barrier that she was unable to work due to her back pain. (Tr. at 379.)

Because of Plaintiff's past hospitalization, it is apparent that she was familiar with mental health treatment, yet Plaintiff did not seek treatment, other than medication, until shortly before Dr. Barrier rendered his opinion. Cf. Johnson v. Barnhart, 434 F.3d 650, 658 (4th Cir. 2005) (the failure to seek help constitutes a reason for discounting subjective claims). Moreover, one may

-18-

doubt Plaintiff's level of distress even at that time, for two reasons. First, medical records show that she sought a psychiatrist's aid in October 1999 through March 2000 (see Tr. at 372-74), but continued to work. Additionally, Plaintiff's treatment in 2005 was short-lived.

Plaintiff went to Daymark Recovery Services for a clinical assessment on August 26, returned for treatment on September 15 and September 29, and then did not return. (Tr. at 352-70.) Plaintiff testified that she did not like her black male caregiver because "he would look at me like he was taking my clothes off," yet also that Dr. Barrier urged her to ask for another therapist. (Tr. at 49-50.) And Daymark rated Plaintiff's GAF[10] at 60 when it formulated her treatment plan, indicating only moderate symptoms. (Tr. at 355.) Plaintiff did not seek further mental health treatment at least through the end of the relevant period.

Plaintiff contends that "Dr. Barrier identified numerous psychiatric symptoms, including recurrent panic attacks, difficulty

---

[10]Global assessment of functioning ("GAF") "is a standard measurement of an individual's overall functioning level 'with respect only to psychological, social, and occupational functioning.'" Boyd v. Apfel, 239 F.3d 698, 700 n.2 (5th Cir. 2001) (quoting American Psychiatric Association, Diagnostic & Statistical Manual of Mental Disorders 32 (4th ed. 1994). The GAF Scale, ranging from zero to 100, is divided into ten ranges of functioning, e.g., 90 (absent or minimal symptoms) to 1 (persistent danger of severely hurting self or others, or unable to care for himself). The GAF rating is within a particular decile if either the symptom severity or the level of functioning falls within the range. The lower the GAF score, the more serious the symptoms. A GAF score of 60 reflects "'moderate symptoms (e.g. flat affect and circumstantial speech, occasional panic attacks) OR any moderate difficulty in social, occupational, or school function (e.g., few friends, conflicts with peers or co-workers).'" Id. at 700 (citation omitted).

-19-

thinking or concentrating, hostility and irritability, among others, that would result in frequent deficiencies of concentration, persistence or pace and repeated episodes of deterioration or decompensation in work or work-like settings." Pl.'s Br. at 6. But Dr Barrier's records contain only Plaintiff's reports of panic attacks, and none of episodes of decompensation. Moreover, as frequently as Dr. Barrier saw Plaintiff, the Court presumes that Margaret Moore, as will be discussed next, knows her even better. <u>Cf.</u> 20 C.F.R. Part 404, Subpart P, App. 1, § 12.00D.

Ms. Moore filled out a "Function Report Adult - Third Party" on Plaintiff's behalf. She answered that she had known Plaintiff a "long time," that she saw Plaintiff one to two days per week, and that she had even spent nights with Plaintiff. (Tr. at 84.) Ms. Moore said that Plaintiff had no problem getting along with others, and that "anyone can get along with [Plaintiff]." (Tr. at 88, 91.) She stated that Plaintiff follows instructions well and handles stress "very well." (Tr. at 89, 90.) Ms. Moore had not noticed that Plaintiff exhibited any unusual fears or behavior. (Tr. at 90.)

In addition, the opinion of Dr. Barrier, apparently a general practitioner, is not supported by the consultative examination report given by Dr. Detrick, a psychiatrist. Dr. Detrick noted that Plaintiff's attitude was cooperative (Tr. at 217); Dr. Adekanmbi had likewise found Plaintiff to be "very pleasant and cooperative" (Tr. at 225). Plaintiff stated that she got along with others, and did so when she was working. (Tr. at 218.)

Plaintiff currently took care of her young grand-nephew (of whom she had voluntarily obtained custody) and a pet dog. (See also Tr. at 36, 107.) Although Plaintiff testified to her discomfit in public, she also testified that she shopped three times per week (Tr. at 55), and she told Dr. Detrick that she shopped, visited, and enjoyed going out with friends or her daughter (Tr. at 218.)

In contrast to Dr. Barrier's opinion, Dr. Detrick assessed Plaintiff's attention and concentration as only "mildly impaired." (Tr. at 219.) Also, he found no evidence of psychotic reactions. Plaintiff's assessment at Daymark revealed similar findings, with her cognition, memory and attention found to be within normal limits. (Tr. at 359.) Plaintiff was neither argumentative, uncooperative, nor hostile, but rather, "personable." (Tr. at 359, 360.) Although she said that she did not want to leave the house, she told the caregiver that she wanted to go out and do things, but her husband did not. (Tr. at 357, 360.) Long-term care was not indicated. (Tr. at 370.) And despite all of Plaintiff's complaints, she told the therapist that she wanted to regain custody of her grand-nephew. (Tr. at 355.)

Plaintiff argues that, "[i]n the First Circuit," the opinion of a non-treating, non-examining physician cannot "'trump the findings'" from a treating physician. Pl.'s Br. at 6 (quoting Weiler v. Shalala, 922 F. Supp. 689, 697 (D. Mass. 1996)). This both twists the finding in Weiler and is not the general rule under Social Security law. In Weiler, the court found nothing which would allow the ALJ to discount the treating physicians' opinions

-21-

or support the non-treating physicians' alternative opinions.  The opposite is true in this case.

The state agency consultants and program physicians and psychologists who perform the RFC assessments are experts in Administration disability programs, and the regulations require factfinders to consider their findings of fact.  SSR 96-6p, 61 Fed. Reg. 34466, 34467 (citing 20 C.F.R. § 404.1527(f) and § 416.927(f)).  Ruling 96-6p also provides that, "[i]n appropriate circumstances," the opinions of state consultants may be entitled to greater weight than that of a treating physician.  <u>Id.</u> at 34468. Indeed, in the Fourth Circuit, "the testimony of a non-examining physician can be relied upon when it is consistent with the record" <u>Smith v. Schweiker</u>, 795 F.2d 343, 345-46 (4th Cir. 1986) (citing <u>Kyle v. Cohen</u>, 449 F.2d 489, 492 (4th Cir. 1971)).  The ALJ explained that he adopted the experts' findings because they were "well-supported by medically acceptable clinical and laboratory diagnostic techniques and are not inconsistent with the other substantial evidence in the record.  . . .  [T]hey provided specific reasons for their opinions about the claimant's [RFC] showing that they were grounded in the evidence in the case record[.]"  (Tr. at 25-26.)  He also discounted Dr. Barrier's opinions for reasons previously discussed.

Ultimately, "[i]t is the ALJ's function to resolve conflicts among the opinions of various treating and examining physicians." <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1218-1219 (8th Cir. 2001). <u>See also</u> <u>Smith v. Chater</u>, 99 F.3d 635, 638 (4th Cir. 1996) ("The

duty to resolve conflicts in the evidence rests with the ALJ, not
with a reviewing court.") (citing <u>Kasey v. Sullivan</u>, 3 F.3d 75, 79
(4th Cir. 1993)).  This court may not reverse an ALJ's decision
"merely because substantial evidence may allow for a contrary
decision." <u>Bergmann v. Apfel</u>, 207 F.3d 1065, 1068 (8th Cir. 2000).
Under the Social Security Act, we must uphold the factual findings
of the ALJ if they are supported by substantial evidence in the
record and were reached through application of the correct legal
standard. <u>Coffman v. Bowen</u>, 829 F.2d 514, 517 (4th Cir. 1987).  In
reviewing for substantial evidence, the court may not undertake to
re-weigh conflicting evidence, make credibility determinations, or
substitute its judgment for that of the ALJ. <u>Hays v. Sullivan</u>, 907
F.2d 1453, 1456 (4th Cir. 1990).  Because substantial evidence
supports the ALJ's decision to discount Dr. Barrier's assessment,
this Court will not remand for reconsideration.

### Issue Three

In her third issue, Plaintiff returns to the subject of her
mental impairments.  Plaintiff alleges that certain behavior, as
recited by the ALJ, supports a finding that "C" criteria are met.

Regulations mandate specific procedures for evaluating mental
impairments.  <u>See</u> 20 C.F.R. § 404.1520a and 20 C.F.R. Pt. 404,
Subpt. P, App. 1, <u>et. seq.</u> [hereinafter cited as "Listings"[11]]

_____

[11]The Listings "is a catalog of various disabilities, which are
defined by 'specific medical signs, symptoms, or laboratory test
results.' [<u>Sullivan v. Zebley</u>, 493 U.S. 521, 530 (1990).]  In order to
satisfy a listing and qualify for benefits, a person must meet all of the
medical criteria in a particular listing.  <u>Id.</u>, 20 C.F.R. § 404.1526(a).
(continued...)

12.00.  Listing 12.00 addresses various potentially disabling mental impairments and instructs that the listing for each impairment begins with a narrative statement describing the disorder.  The Listing then requires evaluation of two sets of criteria known as "Paragraph A" and "Paragraph B" criteria. Paragraph A criteria relate to medical findings.  Paragraph B criteria address impairment-related functional limitations.

Under the applicable analytical sequence (directed in Listing 12.00), the adjudicator examines Paragraph A criteria to ascertain whether there is a medically determinable impairment.  If none is found, the claimant is not disabled.  Listing 12.00(A).  If a medically determinable impairment is found, the adjudicator must then apply paragraph B criteria to assess the claimant's functional limitations.  Generally, a claimant must satisfy one criterion in Paragraph A and two or more in Paragraph B to meet the Listings level of severity and thus qualify for presumptive disability.

In some instances, a Listing for a given mental impairment may have a third set of criteria – Paragraph C criteria – which are alternative impairment-related functional limitations that also are incompatible with the ability to perform any gainful activity.  In that case, if the claimant meets Paragraph A, but does not satisfy the functional limitation prerequisites under Paragraph B, the

---

[11](...continued)
...  When a person claims a disability that is not contained in the listings, or a combination of disabilities, the [Commissioner] requires that the claimant demonstrate his disability, or that the combination of his disabilities, 'medically equal' a listed impairment.  20 C.F.R. § 404.1526(a)."  Bennett v. Sullivan, 917 F.2d 157, 160 (4th Cir. 1990).

-24-

adjudicator must then assess paragraph C criteria.[12]  When Paragraph

C criteria exist, a claimant must satisfy one criterion in

Paragraph A and two criteria in Paragraph B or one criterion in

Paragraph C.  Ultimately, the regulation directs a finding of

disability "if the diagnostic description in the introductory

paragraph and the criteria of both paragraphs A and B (or A and C,

when appropriate) of the listed impairment are satisfied."  Id.

Dr. Barrier's assessment included mental health diagnoses of

anxiety, depression, and panic disorder.  Depression is analyzed

under Listing 12.04, and anxiety and panic disorder under Listing

12.06; both contain Paragraph C criteria.[13]  For Listing 12.06, in

order to meet the Paragraph C criteria, the evidence must establish

that the claimant is completely unable to function independently

outside the area of her own home.  Listing 12.06(C).

Plaintiff clearly has failed to meet this criterion.  When

Plaintiff filed her disability application, she did not indicate

that she did so because her mental impairment prevented her from

going to work.  Plaintiff testified that she shops up to 3 times

per week, and stopped attending church only because she could not

sit for long on the hard benches.  (Tr. at 55.)  Ms. Moore stated

that Plaintiff takes her grand-nephew to and from school, and goes

shopping and to the flea market.  (Tr. at 87, 88.)  In fact, Ms.

---

[12]As Plaintiff, at this point, has focused on "C" criteria only, the
Court will not further address the extent to which she has failed to meet
the "B" criteria for these Listings.

[13]Contrary to Plaintiff's argument, neither Listing addresses
deficiencies of concentration, persistence, or pace in its "C" criteria.

-25-

Moore indicated that Plaintiff exhibits no unusual fears or behaviors. (Tr. at 90.) She said that Plaintiff sits on her porch daily and walks some, although not far. (Tr. at 107.)

For Listing 12.04, the additional "C" criteria are that a claimant's mental impairment is of at least two years duration; has caused more than a minimal limitation of ability to perform basic work activities; and is currently attenuated by medication or psychosocial support. Listing 12.04(C). If the claimant's impairment meets that description, the claimant must prove one of the additional following factors:

> 1. Repeated episodes of decompensation, each of extended duration; or
>
> 2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
>
> 3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.

Id.

Plaintiff focuses her argument on establishing subparagraph (1) above, while ignoring and thereby apparently conceding that she indeed does not meet the criteria in either (2) or (3). In all events, substantial evidence supports the finding of the ALJ and the state expert (Tr. at 238) that Plaintiff does not meet the "C" criteria.

-26-

The Regulations in turn define "episodes of decompensation"
as:

> [E]xacerbations or temporary increases in symptoms or
> signs accompanied by a loss of adaptive functioning, as
> manifested by difficulties in performing activities of
> daily living, maintaining social relationships, or
> maintaining concentration, persistence, or pace.
> Episodes of decompensation may be demonstrated by an
> exacerbation in symptoms or signs that would ordinarily
> require increased treatment or a less stressful situation
> (or a combination of the two). Episodes of
> decompensation may be inferred from medical records
> showing significant alteration in medication; or
> documentation of the need for a more structured
> psychological support system (e.g., hospitalizations,
> placement in a halfway house, or a highly structured and
> directing household); or other relevant information in
> the record about the existence, severity, and duration of
> the episode.

Listing 12.00(C)(4). Thus, Plaintiff's claim that Dr. Barrier's
identification of "numerous psychiatric symptoms . . . that would
result in frequent deficiencies of concentration, persistence or
pace and repeated episodes of deterioration or decompensation,"
Pl.'s Br. at 8, fails to satisfy the third "C" criteria. This same
reasoning applies to Plaintiff's reference to the symptoms she
reported to Daymark. (See Tr. at 358.)

Plaintiff further refers to the ALJ's "recital" of her
behavior in his decision. The ALJ stated:

> It is also noted that the claimant has continued to
> complain of the incident with her brother's attorney to
> treating and evaluating physicians. Additionally, she
> testified regarding incidents of anger management issues
> including suing a treating physician for harassment by
> his staff, incidents of punching her husband in the
> mouth, and ripping the shirt off a (female) neighbor, as
> well as a work-place incident with a co-worker.

(Tr. at 25.)

This recitation by the ALJ does not constitute "proof" on behalf Plaintiff in accordance with the regulations. "The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." Listing 12.00(C)(4). There is no showing that any of these incidents resulted in exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, or that they required increased treatment or a less stressful situation. Plaintiff's records do not indicate thereafter a significant alteration in medication or documentation of the need for a more structured psychological support system. Lastly, only one incident – Plaintiff's alleged assault by an attorney – lasted at least 2 weeks and Plaintiff fails to explain why this is evidence of her mental problems, unless she is conceding she provoked the assaults. Accordingly, Plaintiff has failed to show that she satisfies the "C" criteria for either Listing 12.04 or 12.06.

### Issue Four

Plaintiff next disputes the ALJ's finding that she can perform medium work and, thus, can perform her PRW. Plaintiff again refers to her argument that the ALJ erred in favoring the assessment of the state agency experts over the opinion of her treating physician, Dr. Barrier. This issue has already been resolved against Plaintiff in Issue One, supra.

At step four of the sequential analysis, the question is whether the claimant can perform his PRW. Hunter v. Sullivan, 993

-28-

F.2d 31, 35 (4th Cir. 1992). "[A] claimant will be found 'not disabled' if he is capable of performing his [PRW] either as he performed it in the past or as it is generally required by employers in the national economy." Pass v. Chater, 65 F.3d 1200, 1207 (4th Cir. 1995) (citing SSR 82-61). Thus, the concept of PRW not only includes the claimant's specific job, but also his occupation or line of work. Smith v. Heckler, 782 F.2d 1176, 1181 (4th Cir. 1986).

To find the ALJ's decision supported by substantial evidence, the court must determine that the ALJ's hypothetical questions to the vocational expert (VE) were proper. An ALJ has discretion in framing hypothetical questions as long as they are supported by substantial evidence in the record, but the VE's testimony cannot constitute substantial evidence in support of the Commissioner's decision if the hypothesis fails to conform to the facts. See Swaim v. Califano, 599 F.2d 1309, 1312 (4th Cir. 1979). The ALJ, however, is not bound to include in the hypothetical those complaints which he finds not credible or irrelevant. See Walker v. Bowen, 889 F.2d 47, 49-51 (4th Cir. 1989).

In questioning the VE at Plaintiff's hearing, the ALJ referred him to the state experts' assessments for both mental and physical RFC. (Tr. at 57.) The psychiatric consultant concluded that Plaintiff could perform simple, routine, repetitive tasks in a low-production, non-demanding work setting. (Tr. at 243.) The physical RFC assessment opined that Plaintiff could perform medium work with no limitations. (Tr. at 245-52.)

-29-

The ALJ then asked the VE if a hypothetical claimant of Plaintiff's age, educational background, and vocational history, and with the suggested RFC,[14] would be able to perform Plaintiff's PRW. (Tr. at 57-58.) The VE answered affirmatively. As the ALJ ultimately adopted the experts' RFC opinions, there was no error in his step four finding. Because the ALJ did not find Plaintiff's allegations wholly credible,[15] or adopt Dr. Barrier's restrictions, he was not required to ground his decision on a hypothetical that incorporated either. As none of Plaintiff's challenges to the ALJ's RFC finding have prevailed, Plaintiff presents no reversible error in the ALJ finding that she can perform her PRW.

Plaintiff also complains that the ALJ did not question the VE about the existence of other work that Plaintiff could perform. An ALJ can discharge his burden to identify jobs that exist in significant numbers in the economy by calling upon VE testimony as to whether there were other jobs which the claimant could perform given his RFC, age, education and work experience. See Smith v. Schweiker, 719 F.2d 723, 725 (4th Cir. 1984); Grant v. Schweiker, 699 F.2d 189,192 (4th Cir. 1983). But because the ALJ found against Plaintiff at step four, there was no need for him to proceed to a step five evaluation. Cf. Hunter v. Sullivan, 993

---

[14]Plaintiff, in her Response Brief, argues that the ALJ failed both to determine the mental RFC of her PRW and to take expert evidence thereon. Clearly, this was not the case, as the ALJ questioned the VE specifically on this topic in referencing the consultant's RFC findings.

[15]At no point has Plaintiff challenged the ALJ's credibility finding.

F.2d 31, 35 (4th Cir. 1992) (the burden of persuasion is on the claimant through the fourth step).

    **IT IS THEREFORE RECOMMENDED** that Plaintiff's motion for summary judgment (docket no. 7) be denied, that Defendant's motion for judgment on the pleadings (docket no. 11) be granted, and that Judgment be entered dismissing this action.

                                                _Russell A. Eliason_
                                    **United States Magistrate Judge**

January 20, 2009

-31-